IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JENNI DAVIS, | § | |
| ROBERT VALLES, JR., | § | |
| KEVIN BLAGG and | § | C.A. NO. 5:18-cv-45 |
| MATTHEW DEXTER, | § | |
| on behalf of themselves and | § | |
| all others similarly situated, | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | |
| | § | |
| GENERAL MOTORS COMPANY and | § | |
| GENERAL MOTORS, LLC , | § | |
| Defendants | § | |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

# INTRODUCTION

1.    Defendant **GENERAL MOTORS COMPANY** and its wholly owned subsidiaries, including Defendant **GENERAL MOTORS, LLC**, collectively referred to as "GM" and "General Motors", is one of the world's largest automakers and currently the number one seller of pickup trucks and full-size SUVs in the United States.[1] Its mission statement: "To Earn Customers for Life." Part of this avowed mission includes GM's "Commitment" to "assign the highest priority to matters that impact our customers' well-being and quality of life" and "to maintain the highest

---

[1] Press Release, General Motors, Three-peat: Chevrolet's Retail Share Grows For Third Consecutive Year—Up 1 Point Since 2015; (January 3, 2018) http://media.gm.com/content/dam/Media/gmcom/investor/2018/jan/GM-Dec-2017-US-Sales-Release.pdf, last viewed January 8, 2018.

quality standards."[2] As the President of General Motors, Mary Barra, said on June 5, 2014, in the wake of the Valukas Report regarding the GM ignition switch issues: "Our job is clear. To build high quality, safe vehicles."[3]

2.      Unfortunately, rather than adhering to its own mission statement, its written commitment to customers and its President's public declaration, General Motors designed, manufactured, marketed and distributed a line of pickup trucks and full-size SUVs with a defective air conditioning system (hereinafter "Class Defect") and concealed the existence and exact nature of the Class Defect from owners, lessees and prospective customers. On information and belief, the vehicles with the Class Defect include the 2015 to 2017 model Cadillac Escalade and Escalade ESV; the 2015 to 2017 model Chevrolet Suburban; the 2015 to 2017 model GM Yukon and Yukon XL; the 2015 to 2017 model Chevrolet Tahoe; the 2014 to 2017 model GMC Sierra 1500; the 2015/2016 model GMC Sierra Heavy Duty; the 2014 to 2017 model Chevrolet Silverado 1500 and the 2015/2016 model Chevrolet Silverado Heavy Duty (hereinafter "Class Vehicles"). Not only did Defendants design, manufacture, market and distribute the Class Vehicles with a defective air conditioning system, but its own documents show General Motors was aware of the Class Defect and neither warned prospective customers nor alerted

---

[2] General Motors' mission statement and "Our Commitment" can be found at https://www.gm.com/company/about-gm.html (last viewed December 19, 2017).

[3] http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-mary-remarks.html/

those who had already purchased or leased Class Vehicles to the problem. This defect in the air conditioning system and GM's conduct form the basis of this class action lawsuit.

3.      Plaintiffs are among the General Motors' customers who purchased or leased Class Vehicles. They, and all others similarly situated, were misled by General Motors' misrepresentations, deceived by GM's failure to disclose the Class Defect and harmed by the defective air conditioning system designed and installed by Defendants in the Class Vehicles. Plaintiffs bring this class action lawsuit both for themselves and on behalf of all persons who purchased or leased General Motors' Class Vehicles with the Class Defect.

## PARTIES

*Jenni Davis*

4.      Plaintiff Jenni Davis is a resident of Huffman, Harris County, Texas, and a citizen of the State of Texas. She is a buyer for an iron and steel company and has no special knowledge or experience in the areas of the design, manufacture, distribution or marketing of vehicles. In November 2014 Mrs. Davis purchased a new 2014 Chevrolet Silverado, VIN 3GCPCTEC4EG542408, from Turner Chevrolet in Crosby, Texas. Davis had just been promoted to buyer by her employer, a field job that required her to travel on a daily basis, and she wanted a safe, dependable, durable, comfortable, well-engineered and reliable means of transportation.

5.      This was Mrs. Davis's first pickup truck. In making the decision to buy the Silverado, Mrs. Davis relied heavily on representations made in advertisements by General Motors that the Silverado was a durable, reliable, high quality, safe and dependable vehicle. When she spoke with the salesman at Turner Chevrolet prior to her purchase, she was assured the statements made by General Motors in its advertising were true.

6.      Prior to purchasing the 2014 Chevrolet Silverado Mrs. Davis saw General Motors' advertisements, reviewed brochures, and spoke to the salesman at Turner Chevrolet about the car. At no time was she either told verbally or warned in writing that the 2014 Silverado had defects in its air conditioning system which could cause the system to cease functioning properly without any warning. Had she been so advised, she would not have purchased the Silverado, but instead would have purchased a competitor's vehicle or, at a minimum, bought the Silverado, but at a lower price. At the time of her purchase a reliable air conditioning system was very important to Mrs. Davis. Her job called for her to be on the road, traveling from business to business, and doing so in Harris County, Texas without a dependable air conditioning system was a non-starter.

7.      Mrs. Davis's Silverado developed its first problem in December 2015. On the 21st she took her Silverado to the Turner service department and reported that the "A/C is blowing hot air from vents." The service department inspected her vehicle, found the compressor to condenser hose was leaking, replaced the hose and added a bracket per GM Technical Service Bulletin #PIT5331. Turner charged

Mrs. Davis $100.00 for this work. The repair held until April 2017, when the Silverado again began blowing hot air through the vents. Mrs. Davis took her car back to Turner, where she was advised her condenser had failed. Turner gave her an estimate for the cost of replacement and installing the new condenser that was astronomical, and told her that the part was back-ordered and they were not sure when one would reach them to install in her vehicle. Mrs. Davis could not wait an indefinite amount of time for a new condenser, so she took her car to Hayes Automotive, Inc. Hayes Automotive was able to obtain a new condenser and replace her old one within two days for significantly less than Turner's estimate. Mrs. Davis's repair cost for her condenser totaled $482.49. In addition, she had to rent a car for two days so she would not miss time from work, a cost that totaled $84.59. In addition to overpaying for her 2014 Silverado, paying repair and replacement costs for air conditioning parts and incurring the costs of renting a replacement vehicle, Mrs. Davis also incurred the loss of time to take the Silverado to and from the shops for repair, the loss of use of the vehicle while it was in the shops for repairs and a diminution in value of the Silverado described above as a result of the defect.

### Robert Valles, Jr.

8.    Plaintiff Robert Valles, Jr. is a resident of Houston, Harris County, Texas, and a citizen of the State of Texas. He is a lawyer by trade with no special knowledge or experience in the realm of the design, manufacture, distribution or marketing of vehicles. On or about October 13, 2015, Valles entered into a three-year lease for a 2016 Cadillac Escalade ESV 2WD, VIN 1GYS3JKJXGR162598,

from Sewell Cadillac in Houston, Texas for the purpose of providing his wife Sherry and their four children a safe and reliable means of transportation. Part of that safety calculus included an air conditioning system that functioned, an especially important consideration for Robert given the age of his children and the heat and humidity in Houston, Texas.

9.    In making the decision to lease a Cadillac Escalade, Valles relied, in part, on representations made in advertisements by General Motors that the Cadillac was a well-engineered, high quality, safe and dependable vehicle with plenty of space for his whole family. When he spoke with the salesman at Sewell Cadillac prior to leasing the Escalade, he was assured these statements made by General Motors were true.

10.    Prior to leasing the 2016 Cadillac Escalade ESV 2WD, VIN 1GYS3JKJXGR162598, Mr. Valles saw advertisements, reviewed brochures, and spoke to the salesman at Sewell Cadillac about the car. At no time was he told verbally or advised in writing that the 2016 Escalade had defects in its air conditioning system which could cause the system to cease functioning properly without any warning. Had he been advised the 2016 Escalade had defects in the air conditioning system that could cause it to fail to function without notice to the operator, he would not have leased the Escalade, but instead would have purchased or leased a competitor's vehicle or only agreed to much lower lease payments.

11.    In the Spring of 2017, with approximately 38,000 miles on the vehicle, Valles's 2016 Cadillac Escalade began to have problems with the air conditioning

system— it started blowing hot air and stopped cooling the passenger compartment completely. The car was taken to the Sewell Cadillac service shop, where the dealership's mechanics diagnosed it as having a defective condenser. The dealership's service department told the Valles family the car's condenser would have to be replaced with a new part, the new part had to be ordered, and it would take some time before the new part would arrive in the shop and the condenser could be replaced. The Valles family was provided a smaller loaner car, and approximately five weeks after giving the dealership their car, the Escalade Mr. Valles was leasing was returned to him with the condenser replaced. Valles never received any notice of a defect in the air conditioning system of Cadillac Escalades prior to the time the condenser failed, and after the failure no one advised Valles the condenser problem he experienced with his car was present in all 2016 Escalades.

12.    Because it was a leased car, there was no charge for the replacement of the air conditioning condenser. The Valles family, however, lost time when having to take their vehicle in for repair, experienced a loss of use during the weeks they had to wait for their car to be repaired and Robert was required to continue to pay the monthly lease payment of $1,550.00, even though he and his family did not have access to or use of the vehicle.

### *Kevin Blagg*

13.    Plaintiff Kevin Blagg is a resident of Monticello, Arkansas, a citizen of the State of Arkansas and a farmer. He has no special knowledge or experience in the design, manufacture, distribution or marketing of vehicles. Blagg owns several

Class Vehicles, including a 2014 Sierra K15, VIN 1GTV2TEC1EZ243503, and 2014 and 2015 Silverados, VINs 3GCUKSEC4EG510672 and 1GCVKREC8FZ335728, respectively. The 2014 Sierra was purchased from Lucky Chevrolet in Monticello, the 2014 Silverado was purchased used from a private seller and the 2015 Silverado was purchased new from Smart Chevrolet in White Hall, Arkansas.

14.    Kevin Blagg made the decision to buy the above-listed Class Vehicles based on many factors, one of which was claims made by General Motors that he saw on television over the years, especially the ones after GM took bankruptcy, in which "New GM" bragged about the high quality engineering that goes into its products and how durable and dependable its pickup trucks were. Durability, dependability and quality engineering are important to Blagg, because he uses the Sierra and Silverados in the day-to-day operations of his farm. If they are not functioning properly, he is not able to finish the chores required for the daily operation of his farm.

15.    At no time prior to his purchase of any of the Class Vehicles was Kevin Blagg either told verbally or advised in writing the Class Vehicles had defects in their air conditioning systems. An important factor in Kevin Blagg's purchase of the Class Vehicles was that he was buying trucks that did not have a defect in their air conditioning system. Having a functioning air conditioner is essential to safe and comfortable farming operations. Had Blagg been advised the Sierra and Silverados he was purchasing had defects in their air conditioning system, he would not have purchased them, but instead would have purchased a competitor's vehicle.

16.     The three Blagg Class Vehicles each developed problems with the air conditioning system when the vehicles had between 40,000 and 45,000 miles on the odometer, just out of warranty. Each vehicle's air conditioning system failed due to a defective condenser and each vehicle required replacement of the condenser. With respect to one of Kevin's Class Vehicles, the refrigerant that leaked out caused the compressor to lock up, requiring it to be replaced as well. The cost of replacing the condensers totaled approximately $850.00 for each vehicle. Additionally, Blagg had to purchase and have a new compressor installed. In addition to these repair costs, when Kevin went to have the condensers replaced, he learned they were back-ordered. In some instances, the delay in obtaining replacement parts was weeks to months. While his Class Vehicles were awaiting new condensers, Blagg would add more refrigerant into the air conditioning system of the pickups each day they were driven so that they could be used. One of the air conditioning systems failed in the heat of the summer, however, and that Class Vehicle had to be taken out of service until the replacement part(s) arrived. In addition to overpaying for these three Class Vehicles, as a result of the Class Defect, Kevin Blagg has had to pay repair and replacement costs, incur the loss of use of the vehicles while they were down or in the shop for repairs and suffered a diminution in value of the Sierra and Silverados described above.

17.     In addition to the Sierra and two Silverados, Kevin Blagg owns other Class Vehicles whose air conditioning systems have not yet failed, including four Yukons. Because of the Class Defect, the other Class Vehicles Blagg owns have

suffered a diminution in value and are now worth less than they would be if they did not have defects in the air conditioning system.

*Matthew Dexter*

18.    Plaintiff Matthew Dexter is a resident of Houston, Harris County, Texas and a citizen of the State of Texas. He owns a 2015 Chevrolet Silverado 1500, VIN 3GCPCREC6FG164225. Dexter purchased the vehicle new in September 2014 from Classic Chevrolet in Sugarland, Texas. Dexter has owned and driven the vehicle continuously since that time. The vehicle currently has slightly under 35,000 miles on it.

19.    Mr. Dexter, currently an attorney and formerly a police officer with the Houston Police Department, has no special knowledge or experience in the realm of the design, manufacture, distribution or marketing of vehicles. Instead, he relied, in part, on the representations that General Motors has made in its advertising over the years about its vehicles in general and pickup trucks in particular. Amongst other representations, Mr. Dexter relied on claims that Silverados were durable, dependable, safe, well-engineered and comfortable.

20.    Plaintiff Dexter specifically purchased his Silverado with the understanding it had a functioning air conditioning system without defects. His job requires him to spend a considerable portion of his time each day in his vehicle, and having a dependable and functioning air conditioning system in Houston is essential to him as a professional. He was never told or advised in writing there was a defect in the air conditioning system of his Silverado. Had Dexter been so advised, he

would not have purchased the 2015 Chevrolet Silverado 1500, VIN 3GCPCREC6FG164225, or he would have paid significantly less for it.

21.    The air conditioning system of Dexter's Silverado has not yet failed, but the defects in this system diminish the value of his vehicle. A Silverado in Texas with a defective air conditioning system that could fail at any moment without notice to the operator is worth less than the identical vehicle without a defective air conditioning system.

*Defendants*

22.    Defendant General Motors Company is a Delaware corporation with its principal place of business located in Detroit, Michigan. Defendant can be served with citation and a copy of Plaintiff's Original Class Action Complaint by serving its registered agent for service of process: Corporation Service Company d/b/a CSC-Lawyers Inco, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

23.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located in Detroit, Michigan. Based on information and belief, the sole member of General Motors LLC is General Motors Holdings LLC, and the sole member of General Motors Holdings LLC is General Motors Company. Both are Delaware corporations with their principal places of business in Detroit, Michigan. Defendant General Motors LLC can be served with citation and a copy of Plaintiff's Original Class Action Complaint by serving its registered agent for service of process: Corporation Service Company d/b/a CSC-Lawyers Inco, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

24.    This Honorable Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action as defined by 28 U.S.C. §1332(d)(1)(B), in which the amount in controversy exceeds $5,000,000.00 exclusive of costs and interests and in which a member of the class of plaintiffs is a citizen of a State different from Defendants.

25.    This Honorable Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because this is an action between citizens of different States where the amount in controversy exceeds $75,000.00.

26.    This Honorable Court has personal jurisdiction over Defendants. This case arises out of contacts Defendants have with Texas. At all times material to this case Defendants were engaged in the design, manufacture, marketing and/or distribution of Class Vehicles in the State of Texas. Indeed, based on information and belief, Texas is far and away the largest market in the United States for the Class Vehicles.[4] Further, based on information and belief, all the Cadillac Escalades, Chevrolet Suburbans and Yukons and a large portion of the Chevrolet Tahoes at

---

[4] "According to Dave Sullivan, product analysis manager at AutoPacific, Texas buys more trucks than any other state in the country. It's not a small margin either. [According to] Edmunds.com, one in five trucks sold in the US are sold in Texas. Hugh Milne, marketing and advertising manager for the Chevy Silverado line, said that trucks are key fixtures in Texas society, as both work trucks and luxury vehicles (or Texas Cadillacs as Milne called them). Milne said Texas is so important in the truck market that if you want to be successful in the rest of the country, 'you've got to be successful in Texas.'" https://www.autoblog.com/2016/09/29/why-texas-special-edition-trucks-exist/ posted September 29, 2016 (last viewed December 19, 2017).

issue were manufactured in Texas at GM's facility in Arlington, Texas. This cause of action arose from, or is connected with, purposeful acts committed by GM in Texas. Alternatively, GM conducted substantial and/or continuous and systematic activities in the State of Texas such that both Defendants are "essentially at home" here, and exercising jurisdiction over Defendants is reasonable.

27.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because each Defendant is a "resident" of the Western District of Texas and a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas. As discussed above, both Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District. Additionally, many of the transactions and vehicles giving rise to this claim occurred, or are located, in this District.

## FACTUAL ALLEGATIONS

### *How Car Air Conditioning Systems Function*

28.    Almost all modern automobile air conditioning systems function in basically the same fashion: they cool the passenger compartment of the vehicle by blowing ambient air over a cold evaporator and into the passenger space. The evaporator is cooled by a chemical reaction involving an inert gas (typically r134a).[5]

---

[5] Many often refer to the inert gas used as a refrigerant in car air conditioning systems as "freon". This is like referring to copying machines as "xeroxes". Freon is actually a registered trademark of The Chemours Company, which uses it for a number of halocarbon products designed to help cool interiors.

This gas (referred to in this pleading as a "refrigerant") circulates in a sealed system through various components that either pressurize or depressurize and heat or cool the refrigerant until it reaches the necessary temperature to allow the evaporator to become cold enough that the air blown through the evaporator will turn cold and cool the interior of the car. The key to a functioning air conditioning system is for the system through which the refrigerant circulates to remain sealed, or closed. If a leak develops in the system, the refrigerant will escape, the evaporator will not cool down and the air blown across the evaporator will not turn cold and cool the interior of the car. Additionally, if the refrigerant leaks out of the closed system, it leaves components of the system at risk for seizing up and failing.

29.    In order to more fully understand the Class Defect, it is useful to examine a typical car's air conditioning system in more detail. The diagram below shows a typical vehicle air conditioning system.



30.    The system is designed to allow the refrigerant to pass through a series of chemical reactions in order to reach the temperature and pressure necessary to cool the evaporator. The first stop for the refrigerant in this process is the compressor. The compressor is a belt driven pump responsible for compressing the refrigerant and pumping it to its next stop. The compressor accomplishes its purpose by drawing into the suction side of the compressor refrigerant that is in a liquid, low-pressure, moderate temperature state and compressing the refrigerant into a high pressure, high temperature gas. The compressor then pumps the refrigerant in its gaseous state through a line to the condenser.

31.    The condenser resembles and functions like a radiator. The hot, compressed refrigerant in a gaseous state comes through the compressor to condenser line and enters the top, or high side, of the condenser. In the condenser the refrigerant is cooled. As it cools, the refrigerant condenses and ultimately exit at the bottom of the condenser as a high-pressure liquid. The cooled liquid refrigerant flows from the condenser through a line into the drier.

32.    The drier has two functions: (1) it "dries" the refrigerant (inside the drier is a desiccant bag that absorbs any moisture that may have contaminated the refrigerant) and (2) it stores the liquid refrigerant until needed.

33.    After the drier the refrigerant flows through another line to the expansion valve. The high-pressure liquid enters the expansion valve, where an internal valve allows only a limited, controlled portion of the refrigerant to exit and enter the evaporator. This internal control over the passage of the refrigerant allows

the higher temperature fluid to cool by keeping the pressure low. This now low-pressure refrigerant flows through a line from the expansion valve into the vehicle's evaporator.

34.    The evaporator, as its name suggests, evaporates. When the low-pressure refrigerant enters the evaporator, it starts to boil, changing from a liquid back into a gas. As it boils it absorbs heat, including heat from the physical structure of the evaporator itself. This causes the evaporator to become very cold. Meanwhile, the air conditioning system's blower motor and fan are pushing air across the cold evaporator. This passage converts ambient temperature air into the chilled air that enters the passenger compartment. The compressor, in the meantime, draws in the low-pressure refrigerant from the evaporator, and the cycle starts again.

**The Class Vehicles**

35.    The Class Vehicles involved in this case are:

- •    Cadillac Escalade and Escalade ESV, model years 2015 to date;
- •    Chevrolet Suburban, model years 2015 to date;
- •    GM Yukon and Yukon XL, model years 2015 to date;
- •    Chevrolet Tahoe, model years 2015 to date;
- •    GMC Sierra 1500, model years 2014 to date;
- •    GMC Sierra Heavy Duty, model years 2015/2016;
- •    Chevrolet Silverado 1500, model years 2014 to date; and
- •    Chevrolet Silverado Heavy Duty, model years 2015/2016.[6]

---

[6] http://gmauthority.com/blog/gm/gm-platforms/k2xx/ (last viewed December 20, 2017).

Based on information and belief, the Class Vehicles are all built on a single vehicle platform, referred to internally at General Motors as GMT K2XX,[7] and the air conditioning systems in these Class Vehicles share the same design. Based on information and belief, at least 2 million Class Vehicles have been sold in the United States.[8]

### The Class Defect in the Air Conditioning System

36.    The defect in Class Vehicles is that various components of the air conditioning system fail during normal, everyday use, allowing the refrigerant to leak out. This prevents the evaporator from becoming cold, causing the system to blow hot air into the car's passenger compartment and, in some cases, causing other parts of the system to fail. Based on information and belief there are at least two defective components.

37.    The first is the line leading from the compressor to the condenser. This line consists primarily of an aluminum tube connected to a rubber hose. On information and belief, the compressor to condenser line fails in two ways. First, the

---

[7] *Id.*

[8] http://media.gm.com/dld/content/Pages/news/us/en/2017/jan/0104-gmsales/_jcr_content/rightpar/sectioncontainer_0/par/download_0/file.res/Deliveries-December-2016.pdf; http://media.gm.com/dld/content/Pages/news/us/en/2016/Jan/0105-gmsales/_jcr_content/rightpar/sectioncontainer_0/par/download_0/file.res/GM-Deliveries-December-2015.pdf; http://media.gm.com/dld/content/Pages/news/us/en/2015/Jan/gmsales/_jcr_content/rightpar/sectioncontainer/par/download_0/file.res/Deliveries-December-2014.pdf; and http://media.gm.com/dld/content/dam/Media/gmcom/investor/2014/jan/Deliveries-December-2013.pdf

aluminum tube can become disconnected from the rubber hose, creating an opening in the line that allows the refrigerant to escape. Second, the aluminum tube itself can rupture, also allowing refrigerant to escape.

38.     GM has recognized this defect. It no longer manufactures the compressor to condenser line that was original equipment in the Class Vehicles. Instead, in Technical Service Bulletin number PIT5331, dated October 6, 2014, General Motors instructed mechanics that if they find a failure in this line, they are to replace it with a newly designed line and install an additional bracket in the system to minimize flexion and movement of the compressor to condenser line. (Exhibit A). Unfortunately, customers who suffer this failure after the vehicle is out of warranty are required to purchase and pay for the installation of these new parts, thus having to pay twice to obtain a functioning air conditioning system. Further, Bulletin #PIT5331 did nothing to protect owners and lessees who had not yet suffered catastrophic failure of their system. They were not even advised of the existence of this latent defect. Finally, subsequent potential purchasers or lessees of the Class Vehicles were not warned of the Class Defect.

39.     The second defective component in the air conditioning system of the Class Vehicles is the condenser itself. On information and belief, the condenser that was original equipment also lacks sufficient strength to withstand the day-to-day normal operation of the Class Vehicles. On information and belief, the condenser is prone to rupture at its neck where the defective line from the compressor enters the condenser. It appears General Motors recognizes the condenser installed as original

equipment in the Class Vehicles is defective. On information and belief, the condenser installed as original equipment on these vehicles is no longer manufactured and/or distributed in the United States for the Class Vehicles. Instead, if an owner or lessee suffers damage to their air conditioning system and the condenser has to be replaced, a condenser with a different design is installed. Once again, customers who have suffered this failure outside the warranty period have to pay for the new parts and their installation, owners and lessees who have not yet suffered a catastrophic failure are left driving Class Vehicles with the original equipment condenser, which is at risk for failure at any moment and potential customers are not advised of this latent defect.

40.    The Class Defect existed at the time the Class Vehicles left the possession of General Motors.

### *The Class Defects Create Safety and Health Dangers*

41.    Obviously lack of air conditioning affects the comfort and well-being of drivers and passengers in Class Vehicles. It also poses a safety hazard, especially in the hot summer months that are the norm in southern states, the locus of the primary purchasers of Class Vehicles. For example, one owner reported being involved in an accident because of the air conditioning defect:

> I have a 2014 Chevy Silverado **air conditioner went out almost got in a very bad accident it was extremely hot outside** had just got off work started driving down the road and **got real dizzy and lightheaded and ended up running into a pole on side of the road I'm very lucky.** That is the only thing that I ran into I

need to get this problem fixed fast before something gets hurt bad.[9]

Two owners expressed concerns for the safety of their children on carproblemzoo.com:

> Vehicle started to blow hot air when air conditioner was on. Brought this in to get it fixed twice and last time we were informed that there is a hole in the condenser and that gm is trying to find a manufacturer for the part but have no timetable as to when the part will be available. We also called gm and they confirmed that there is an issue but have no timetable on when this will be fixed. They were working with one manufacturer that hasn't been able to produced the part so now they are working with another manufacturer. **For the safety of my children, this is unacceptable**.[10]

> I was informed that the [2015 Tahoe] air condenser is a faulty part and is not working on my vehicle. Also, GM has knowledge of this issue, for it is a known issue with Chevrolet Tahoe. The part to fix this problem is on back order, and there are no parts in production, for they have not come up with a remedy to replace the faulty part. Therefore, I do not have air conditioning within my vehicle. **Thus, causing a safety issue, for it is 90 degrees where I live, and I have infant twins that are transported with my vehicle.**[11]

These complaints were echoed by "bridegroom", who noted in his post:

> I have been waiting to get my air conditioner fixed now for months and I keep getting told there are no Condensers available. I have talked with service writers at GM dealership's well as other Sierra owners and they all have the same problem for the most part.

---

[9] www.torquenews.com/3768/owners-2014-chevrolet-silverados-are-hot-about-ac-problems?page=3 (emphasis added) (last viewed December 22, 2017).

[10] www.carproblemzoo.com/gmc/yukon/2015/air-conditioner-problems.php (emphasis added) (last examined December 22, 2017).

[11] http//www.carproblemzoo.com/chevrolet/tahoe/air-conditioner-problems.php (emphasis added) (last examined December 24, 2017).

> This needs to be put on a recall list or I have decided to file a class action lawsuit in this matter regarding all Sierra owners across the country.
>
> **I, as well as I am sure other people, have serious breathing issues in hot weather and need my truck fixed promptly**.[12]

42.    In addition to safety problems posed by exposure to excessive heat in a car, the Class Defect creates a hazard when the climate control system is used to defrost/defog the front windshield. Without a functioning condenser, the defrost/defog modes of the climate control system will not function. This leaves the driver potentially unable to see out of the front windshield. That is what happened to the following driver, who complained to the National Highway Transportation Safety Association.

> GM condenser issue. GM has a known issue with 2014-16 [Tahoes] using a defective condenser. They have a new part# that is on national backorder and are unwilling to do anything for their customers waiting for the part. I was driving down the freeway, kids in tow on a rainy, muggy day....**My windshield began to fog and with no condensor to run the AC I was unable to [de-fog] my windows.** Unable to see a thing, I had to pull over, on the freeway, carefully, and find a child's coat in the very back to wipe down the windows to [get] visibility. **This is a safety issue and clearly negligence on GM's part and they would be liable if/when this creates a serious accident**.[13]

43.    Finally, the defects in the air conditioning system could pose a safety problem if the system fails while the Class Vehicles are in operation. Such a failure

---

[12] https://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml (emphasis added) (last Viewed on December 23, 2017).

[13] NHTSA ODI 10994971 (incident date listed as June 13, 2017) (emphasis added).

could cause the driver to become distracted while he or she adjusts the climate control system in an effort to solve the problem.

44.     It is very clear that the defects in the air conditioning systems of the Class Vehicles not only affect the comfort of those in the vehicles, but also pose serious health and safety risks.

### There Were So Many Defects GM Could Not Repair or Replace the Parts

45.     A cursory review of the websites cited in this pleading reveals hundreds of complaints about the defective air conditioning systems in Class Vehicles. There were so many complaints the NBC Station in Chicago, Channel 5, investigated. Its report was aired on or about August 9, 2017. In the segment Lisa Parker of "NBC 5 responds" reported:

> Drivers of popular General Motors vehicles nationwide say they are in a fix: the A/C in their newer-model trucks is not working, and repair parts are nowhere in sight. Among the vehicles affected: Chevrolet Silverado, Tahoe and Suburban; GMC Sierra, Yukon and Yukon XL; and Cadillac Escalade and Escalade ESV.

> NBC 5 Responds found 100 cases recently reported to the National Highway Traffic Safety Administration and scores of other unhappy GM drivers lashing out online. **While General Motors acknowledges the problem and a national backlog on replacement parts, no recall or notice to dealers, called a Manufacturer's Communication, has been issued**.

> The situation leaves drivers frustrated, waiting weeks to get their hands on the needed part during the hottest part of the year, and for those whose cars are just out of warranty– facing repair estimates ranging from $1,100 to more than $4,000.

(emphasis added). After a conversation with one particular family who found their "condenser hose had cracked", allowing the refrigerant to escape, the reporter noted:

Online, we found plenty of company for the Kuffels [the family whose hose cracked]. Drivers who tell NHTSA they've waited weeks multiple weeks but can't get their hands on needed parts. Some who faced estimates ranging from $1,100 to more than $4,000 to fix it. Many drivers in states with summer temperatures that soared above 100 degrees, afraid to put their kids or their pets in their own vehicles.

Lisa Parker then contacted General Motors, which acknowledged the longstanding backlog, and responded in writing:

"We are aware of the part constraints of air-conditioning units available for service repairs of some GM full-size utilities. We have resolved the issue with our supply base, and have already doubled the number of parts produced each week for service repairs. We expect to fulfill the back ordered parts by the end of August, prioritizing those customers who have waited the longest for replacements. We apologize for any inconvenience this has caused, and are working with customers on an individual basis to meet their needs."

Parker further reported:

GM confirms the models affected include the Chevrolet Silverado, Tahoe and Suburban; GMC Sierra, Yukon and Yukon XL; and Cadillac Escalade and Escalade ESV, but did not specify which model years.[14]

46.    Six weeks later, on September 19, 2017, the NBC station in the Dallas-Fort Worth Metroplex, Channel 5, aired the results of its own investigation. Wayne Carter of D-FW NBC 5 Responds was the reporter for the segment, and it was

---

[14] Report posted on-line on August 10, 2017 found at https://www.nbcchicago.com/news/local/gm-air-conditioning-responds-439572983.html (last viewed December 26, 2017).

posted on-line on September 19, 2017. In his investigation he reported that dozens

of viewers had complained to the station:

> Is there anything more uncomfortable than driving around without air conditioning during a North Texas summer?
>
> Just a few hours can be brutal, but imagine a few months.
>
> Several General Motors customers have been waiting that long to get the A/C repaired in their vehicles. **Many have complained— dozens of you to us.** Now, we have some answers.
>
> The problem is happening in some of GM's full-sized SUVs, including the ones made in Arlington. There are 2014 and 2015 Tahoes, Yukons and Silverados— just a couple of years old— with air conditioning that has gone bad.

(emphasis added). Then Carter reported on the futility of requesting assistance from

GM:

> GM initially told NBC 5 Responds the back-ordered parts would be fulfilled by the end of August. That was nearly three weeks ago. After calling again for an update this week, the GM spokesperson refused to comment.[15]

***General Motors' Documents Reflect Actual Knowledge of these Defects***

47.    General Motors' own documents establish GM had actual knowledge of

the Class Defects in the Class Vehicles almost from the beginning of their

introduction of the Class Vehicles in the market. Technical Service Bulletin

#PIT5331 was issued by General Motors on October 6, 2014. (Exhibit A). It

references "the compressor to condenser line" in early models of the Class Vehicles

---

[15] Report posted on-line on September 19, 2017 at https://www.nbcdfw.com/news/local/
Some-GM-Chevy-Chevrolet-GMC-Owners-Have-Lengthy-Wait-for-Air-Conditioning-
Repairs-445827893.html (last viewed December 26, 2017).

and notes "[s]ome owners may comment that the a/c is blowing warm." General

Motors goes on to write:

> If, after performing normal diagnostics and the source of the leak is either not found, or it is found at/near the rear of the compressor, it may be caused by a small crack in the compressor to condenser line.
>
> The compressor to condenser line may have a small crack or pin hole located at the inside radius of the first bend near the compressor, as shown below.



> If the a/c line cracks, it may spray oil and refrigerant onto the a/c compressor, making the leak very hard to identify.
>
> To repair this condition and prevent it from reoccurring, replace the compressor to condenser line and install the line bracket shown below. After completing the repairs, recharge the refrigerant system and perform a leak test to verify proper operation.



Exhibit A. In order to write this document, on information and belief, General Motors had to have received such a large number of complaints that it felt the need to investigate the cause of air conditioning failures and attempt to develop a solution. The time it would take from receipt of the complaints to investigation into them, to the development of the replacement line and bracket, to the writing and issuance of the Technical Service Bulletin, would indicate that General Motors had actual notice of the air conditioning defects no later than early 2014 and potentially as early as 2013.

48.    General Motors continued to receive notice of the problems with the air conditioning system in Class Vehicles throughout 2014 and into 2015. General Motors maintains on-line forums where customers can register complaints about

their vehicles directly with GM. A number of complaints about the Class Vehicles were made directly to GM on those forums. For example, on August 4, 2014, "Magnes" posted the following:

> We bought our 2014 Chevy Z71 LTZ 4 Door 1/2 ton truck [a Chevy Silverado] last June when they first came out. My wife was hell bent on getting one as soon she saw the new design. We flew from Mississippi to Houston, rented a car, and drove to Austin to pick it up. It's a good looking truck but now that we've had it just over a year, putting some miles on it (almost 34,000), and the warranty is about over with, the AC has gone out on us.
>
> The AC is just blowing hot air. Had been working fine up until this afternoon. The controls all work, the vents change as they should, just no cool air.
>
> Has anyone else had this issue?

He received a response from "Amber N", who identified herself as being with Chevrolet Customer Care. Magnes' post drew a follow-up on August 24th from "Jacobmo", who asked "same issue this morning a/c is blowing HOT air. what was the problem with yours?" Jacobmo's post drew an acknowledgment and reply from "Kristen A." with "Chevrolet Customer Care". That same thread drew subsequent customer complaints on August 31, September 27 and October 7 of 2014, and March 6, March 8, March 10 and March 30, 2015, all about air conditioning issues on this model vehicle. Almost all these posts received a response from individuals identifying themselves as being with "Chevrolet Customer Care". On May 2, 2015, "TexasTank" weighed in, writing:

> Looks like this is a very common issue and gm needs to own up to this issue! I too had my a/c compressor replaced at 17k miles. Now at 42k miles less then a year on the new compressor "yes i

drive allot", my a/c is out again! What is the deal here! I called up the dealer and they supposedly said im out of warranty but since its been less then a year on the new compressor they will have to check with managment [sic] this monday coming [sic] up. I hope i dont get the run around bs because im not in the mood.[16]

49.     On May 29, 2015, General Motors issued Engineering Information Number PIE0340 regarding "A/C Inoperative or Poor Performance on Recent Built Vehicles." (Exhibit B). This document refers to 2015 models of the Class Vehicles. General Motors starts by observing that "Some customers may comment on the A/C not performing as intended or the A/C not performing at all." Most importantly, GM goes on to state that this air conditioning problem "may also be noticed during the Pre-Delivery Inspection (PDI) of a vehicle." This can only mean that before May 2015 dealers were reporting air conditioning problems with early model Class Vehicles **before the vehicles could be placed on the sales lot!** There is even more damaging information contained in this document. Under the heading "Cause" General Motors wrote: "GM Engineering is attempting to determine the root cause of the above condition [A/C Inoperative or Poor Performance]." That would indicate that as of the summer of 2015, not only was GM aware of the air conditioning system defects in the Class Vehicles, but neither knew the cause of the problems nor had developed a solution.[17]

---

[16] All quotes found at https://chevroletforum.com/forum/2014-gmtk2xx-110/2014-silverado-ac-problems-already-67170/

[17] The May 24, 2015 Engineering Information also means the 2014 proposed fix set out in Bulletin #PIT5331, including a new line and a bracket, did not fix the Class Defect.

50.    It appears General Motors has not developed a fix for the Class Defect.

"Tootall 29" wrote on the same GM customer website on October 15, 2017:

> Bought a 2017 LT z71 used and the AC worked great for a while, no reports on the car fax that it had been replaced before, but on the way to Texas the other day (moved from Florida where it was bought) it started blowing warm air. And thats all it really does now.[18]

51.    In spite of the fact that GM has been aware of the air conditioner defects in the Class Vehicles since at least early 2014, it has never advised owners or lessees of the Class Vehicles of the Class Defect, nor has it warned potential purchasers or lessees. To the contrary, General Motors has repeatedly promoted the quality, durability and dependability of the Class Vehicles.[19] For example, in its brochure for the 2014 Chevrolet Silverado 1500 GM describes the vehicle as "Strong. For all the roads ahead" and "Stronger, smarter and more capable than

---

*See,* GM sponsored website http://www.gm-trucks.com/forums/topic/200888-ac-condenser where in response to an inquiry about the bracket, on May 2, 2017, "O_J_Simpson" posted "Won't work. The bracket was not a successful band-aid, I mean fix. GM has a newly redesigned hose in another attempt that is to be used instead of the bracket now." (Last viewed December 23, 2017).

[18] *See also,* You Tube Video posted on May 10, 2017 by mechanic Cesar Vega "2014 GMC SIERRA AC CONDENSER PROBLEM" noting there is "the same exact problem" with "2013 2014 2015 2016 2017 GMC Sierra Chevy Silverado GMC Yukon [and] Chevy Tahoe," "all have the same AC condenser problem." Vega goes on to conclude GM "need[s] to consider this a recall," at https://www.youtube.com/watch?v=c4f Sgqe OMtI (Last viewed December 23, 2017).

[19] This is even though the 2014 Silverado and Sierra had been recalled six times by July 2014 and were referred to as "the year's most frequently recalled vehicles." http://money.cnn.com/2014/07/28/autos/most-recalled-vehicle/index.html (last viewed December 26, 2017). GM could have fixed the air conditioning system while the vehicles were in for repairs to the steering system, transmission, oil cooler line or any of the other reasons for the recalls.

ever." It continues making similar representations in subsequent Silverado brochures, including describing the Silverado as "The most dependable, longest-lasting full-size pickups on the road." (2016 brochure). Similar claims are made about the other makes and models of the Class Vehicles. GM described the 2014 Sierra as GM's "most dynamic and advanced pickup ever"; the 2014 Silverado as serving as "Your new home on the range;" the 2015 Tahoe as providing "Year-round Comfort" and reflecting "Premium in Every Way"; the 2016 and 2017 Chevrolet Suburbans as "The American icon that has no equal" and "the ideal vehicle for the modern family"; and the 2015 Yukon as being "Professional Grade". These brochures were but a piece of the General Motors' multimedia advertising campaign found on television, radio, the internet and billboards and in newspapers, magazines and other print media. All of its advertising was aimed at convincing potential buyers and lessees the Class Vehicles were premium quality products that included "the most dependable, longest lasting vehicles" on the road, providing "year-round comfort" that would allow the cars to serve as the buyer's "new home on the range." Nothing could have been further from the truth.

52.     At least from the beginning of 2014 General Motors was aware it had designed, manufactured, marketed and was actively distributing Class Vehicles with a defective air conditioning system that threatened the safety and comfort of those who drove them or rode as passengers in them. On information and belief, General Motors made the knowing and intentional decision not to advise prospective purchasers or lessees of the defects, and not to notify those who had already bought

or leased the Class Vehicles of the problems. GM apparently received numerous complaints about these problems. There were so many complaints that the needed replacement parts took months to obtain. As if this delay was not enough, GM then charged those who needed repairs and were out of warranty for new parts and labor, in essence requiring them to buy, for the second time, a functioning air conditioning system for their vehicles.

## <u>RULE 9(b) ALLEGATIONS</u>

53.     Pursuant to the requirements of Rule 9(b), Plaintiffs, both individually and in their capacity as class representatives, adopt all allegations set forth in the preceding paragraphs with respect to fraud.

### *What*

54.     The type of facts omitted and/or hidden by General Motors concern the defects in the air conditioning systems of the Class Vehicles designed, manufactured, marketed and sold by Defendants. These defects consisted **at least** of both a compressor to condenser line and a condenser of inadequate strength and sturdiness to withstand normal day-to-day operations of the vehicles. These defects created a condition in which the air conditioning system of a Class Vehicle could fail at any moment without any notice to the driver. General Motors should have notified all who had purchased or leased Class Vehicles of these facts, as well as all prospective purchasers and lessees.

*Why*

55.     The reason the concealment of the defects in the air conditioning system of the Class Vehicles is misleading is because customers are unlikely to purchase a vehicle with known defects, especially ones that could cause the air conditioning system to fail without notice at any moment, when a similar vehicle with a dependable air conditioning system can be bought from a different manufacturer. This makes the reason for the concealment obvious: in a highly competitive market General Motors wanted folks to purchase or lease GM pickup trucks or SUVs as opposed to buying similar vehicles manufactured by their competitors. The sales of the Class Vehicles are especially important to General Motors, as it is these sales that are driving Defendant General Motors Company's corporate profits.[20] While Plaintiffs do not know the identities of the Defendants' employees who will be able to identify the number of Class Vehicles sold, the average profit for each sold, and what percentage of Defendant General Motors Company's profits come from the sales of Class Vehicles, Defendants do and will easily be able to identify those individuals in discovery.

---

[20] "Analysts say GM makes $10,000 or more on each big SUV and pickup [the Class Vehicles] as people load them out with options." The demand is so great that the factories producing these vehicles are "running full-on, three shifts, to meet demand," according to GM's Chief Financial Officer. Tom Kirsher, *GM Is Motoring as Profit Jumps 34 Pct on US Truck, SUV Sales,* Fox Business, April 28, 2017; http://www.foxbusiness.com/markets/2017/04/28/general-motors-profit-up-34-percent-on-us-truck-suv-sales.html, Last viewed January 8, 2018.

*How*

56.    General Motors' own internal documents and documents showing the original equipment parts are no longer manufactured confirm the existence of latent defects in the air conditioning systems of Class Vehicles. The internal documents also confirm that General Motors knew about this problem no later than early 2014, and possibly earlier, yet did not reveal the existence of the Class Defect to those who already owned or were leasing Class Vehicles or to those who were considering purchasing or leasing the vehicles. General Motors' concealment has continued as long as the Class Vehicles have been on the market.

*When and Where*

57.    General Motors should have advised owners and lessees of the air conditioning defects as soon as it became aware of them and should have alerted prospective owners and lessees to the problems prior to their purchase or lease of Class Vehicles. Notice of the air conditioning system defects should have been given to owners and lessees in a recall notice or as part of one of the other recall notices issued with respect to these vehicles. Notice of the air conditioning system defects should have been given to prospective owners and lessees in General Motors' advertising, including TV, radio and internet ads as well as brochures for the Class Vehicles. No such notice has been given. At no time has General Motors admitted publicly the defects exist. At no time has GM advised either purchasers or lessees about the defects, nor has it alerted prospective buyers or lessees to the

problems.[21] Not only has GM concealed the defect from those who have already purchased or leased Class Vehicles, it has continued to market the Class Vehicles in written advertisements as "dependable", "long-lasting", "stronger, smarter and more capable than ever", providing "Year-round Comfort", reflecting "Premium in Every Way", "the ideal vehicle for the modern family" and "Professional Grade".[22]

### Who

58.    Defendants know and can easily ascertain the identity of their employees responsible for designing and testing the air conditioning systems prior to the introduction of the Class Vehicles on the market, as well as those who analyzed the system when problems were reported, developed fixes, and made decisions regarding design changes. Plaintiffs do not have the names of these employees, but Defendants know exactly who they are. The same is true for the identity of those

---

[21] Engineering Information #PIE0340 (Exhibit B) further confirms this deceit. In the opening paragraph of the document GM wrote: "Proceed with this EI ONLY if the customer has commented about this concern AND the PIE number is listed in the Global Warranty Management/Investigate History link (GWM/IVH). If the customer has not commented about this condition or the EI does not show in the GWM/IVH, disregard the PI and proceed with diagnostics found in published service information. THIS IS NOT A RECALL...." In short, look at the defects only if someone asks about it with specificity, otherwise, ignore them and do not advise customers about the cause.

[22] These only reflect the misrepresentations in GM's brochures. On information and belief there are similar misrepresentations in advertising used other mediums. *See, e.g.* GM commercial with Howie Long and GM Chief Engineer Eric Stanczak, posted on You Tube on July 5, 2015, and with 404,161 views as of December 26, 2017. In this commercial, Long states "Everyone knows that Chevy Silverado comes from the family of the most dependable, longest-lasting full size pickups on the road." https://www.youtube.com/watch?v=tLFe8g7E2sc.

who made decisions regarding the marketing of the Class Vehicles and whether to notify owners, lessees and prospective buyers and lessees of the defects.

## CLASS ACTION ALLEGATIONS

### *The Proposed Class*

59.     Plaintiffs bring this lawsuit on behalf of themselves and all other similarly situated individuals and business entities pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), 23(b)(3) and/or 23(c)(4). The proposed National Class includes:

> All persons or entities in the United States or its territories who purchased or leased a Class Vehicle with a defective air conditioning system.

Alternatively, Plaintiffs seek to represent the following state classes:

### **Texas Class**

> All persons or entities in Texas who purchased or leased a Class Vehicle with a defective air conditioning system.

### **Arkansas Class**

> All persons or entities in Arkansas who purchased or leased a Class Vehicle with a defective air conditioning system.

60.     Excluded from these three proposed classes are (a) Defendants, their affiliates, subsidiaries, successors, predecessors, legal representatives, officers, directors and current or former employees, and any entity in which Defendants have a controlling interest; (b) the Judge and/or Magistrate to whom this case is assigned, and any members of their staff; (c) any person who has suffered personal injuries as a result of the defects in the Class Vehicle air conditioning systems; (d) the Estate or

representative of any person who died as a result of the defects in the Class Vehicle air conditioning systems; (e) all federal, state and local governmental entities and agencies; and (f) any person whose claims against General Motors regarding the issues raised in this lawsuit have already been settled or adjudicated. Plaintiffs reserve the right to amend the definition of the proposed classes if discovery and/or further investigation reveals they should be expanded, divided into further subclasses or modified in any other way.

### Numerosity

61.    Although the exact size of the Class cannot be determined without discovery, Plaintiffs believe over two million Class Vehicles have been sold or leased in the United States.[23] Joinder of so many potential parties is impractical. In these circumstances disposition of the claims in a single action will provide substantial benefit to all parties and to the Court. On information and belief, Defendant will have records in its possession that will help identify the members of the Class, however it is configured. Further, the various State Department of Motor Vehicles maintain records which identify the current owners of Class Vehicles and their contact information.

### Predominance of Common Issues

62.    Common questions of law and/or fact exist as to all members of the Class. These common issues predominate over the questions that might affect

---

[23] See footnote 8, *supra.*

individual class members. The common factual and legal issues include, but are not limited to:

a.    Whether there are defect(s) in the air conditioning systems of the Class Vehicles and, if so, the exact nature of the defect(s);

b.    When General Motors first learned, or should have learned, of the defect(s);

c.    What steps General Motors took after learning of the defect(s);

d.    Whether GM developed fixes that cured the air conditioning system defect(s), the nature of the fixes, when the fixes were developed, when the fixes were deployed and whether the fixes solved the problems with the Class Vehicle air conditioning systems;

e.    Whether GM disclosed the existence of the defect(s) in the air conditioning systems to Class Members and, if so, when GM did so and in what fashion;

f.    If GM did not notify Class Members of the defects, why it failed to do so and whether the failure was knowing or intentional;

g.    What express and implied warranties applied to the Class Vehicles;

h.    Whether General Motors breached any express warranties;

i.    Whether the Class Vehicles were unfit for the ordinary purposes for which they were used;

j.    Whether GM breached any implied warranties;

k.    Whether GM engaged in an unconscionable action or course of action;

l.    Whether GM engaged in "false, misleading or deceptive acts or practices";

m.    Whether GM represented the Class Vehicles had characteristics, ingredients, uses, or benefits they did not have;

n.    Whether GM represented that the Class Vehicles were of a particular standard, quality or grade when they were of another;

o.    Whether GM knowingly made false or misleading statements of fact concerning the Class Vehicles' need for parts, replacement or repair service;

p.    Whether Plaintiffs and members of the Class are entitled to equitable relief, including injunctive and/or declaratory relief establishing the Class Vehicles are defective and an order requiring General Motors to notify all Class Members of the defect and to repair the air conditioning systems in all such vehicles without charge;

q.    Whether Defendants committed fraud or fraudulently concealed the facts about the defect in the air conditioning system of the Class Vehicles; and

r.    Whether Defendants made a profit from the sale or lease of Class Vehicles and, if so, the amount of that profit.

### *Typicality*

63.    Plaintiffs' claims are typical of those claims of the Class, as all class members purchased or leased a Class Vehicle with the defective air conditioning system. The fact issues surrounding these claims are the same and Plaintiffs, like all members of the Class, have suffered damages as a result of the conduct of General Motors, including cost of repairs, future cost of repairs, loss of use and diminished value, among others.

### *Adequacy*

64.    Plaintiffs will adequately represent and protect the interests of the Class. None of the Plaintiffs have an interest that conflicts with the interests of the Class. Plaintiffs have retained counsel with substantial experience in both

prosecuting class actions and in prosecuting claims against auto manufacturers for vehicle defects. Plaintiffs and their counsel are committed to vigorous prosecution of these claims and have the financial wherewithal to do so.

### *Superiority*

65.    A class action is the best means for a fair and efficient adjudication of the claims of Plaintiffs and the members of any Class. The Plaintiffs and members of the Classes have all suffered injuries as a result of Defendant's conduct. Given the size of the injury and the expense of prosecuting a claim involving defects in vehicles, it is highly unlikely individual class members would be able to redress the wrongs set out in this pleading. Even if individual Class members could do so, there would potentially be hundreds or thousands of lawsuits filed around the country, clogging the courts and posing the risk of inconsistent or contradictory judgments. Further, from the Defendants' perspective, hundreds or thousands of individual cases around the country would require the Defendants to produce several employees for depositions hundreds or thousands of times and address repetitive document productions and discovery disputes governed by many different rules of civil procedure. A class action allows for efficient adjudication of the common fact and legal issues presented in this case in a manner that is fair to all.

# CAUSES OF ACTION

### *CAUSE OF ACTION NUMBER 1-FRAUD BY CONCEALMENT/NONDISCLOSURE*
**(On behalf of Plaintiffs and the National Class or,**
**Alternatively, the Arkansas and Texas Classes)**

66.     Plaintiffs, individually and on behalf of the National Class or, alternatively, on behalf of the Arkansas and Texas Classes respectively, incorporate by reference all other allegations contained in this pleading.

67.     Plaintiffs bring this cause of action on behalf of themselves and all Class members.

68.     On information and belief, Defendants had actual knowledge of the Class Defects from early 2014, at the latest, and perhaps as early as the Fall of 2013. GM has continually received reports of problems with the air conditioning system since it first became aware of the Class Defect. Defendants concealed these facts and/or failed to disclose them to Plaintiffs and the other members of the Class.

69.     Defendants had a duty to disclose the defects in the Class Vehicles' air conditioning systems because, before learning of the defects, Defendants had made misleading misrepresentations about the quality of the Class Vehicles and their lack of defects. Once Defendants learned of the Class Defects, they knew their prior representations were false or misleading.

70.     Defendants had a duty to disclose the defects in the Class Vehicles to those who had already purchased or leased the vehicles as well as to prospective buyers or lessees because once they learned of the Class Defects, they continued making representations about the quality of the Class Vehicles and their lack of

defects. These representations constituted a partial disclosure of the facts that created a substantially false impression about the Class Vehicles and their air conditioning system. Defendants continued to conceal the true cause of the air conditioning problems in the Class Vehicles when owners and lessees would bring their cars in for service or complain to General Motors about the Class Defects.

71.    Defendants had a duty to disclose the defects in the Class Vehicles because the air conditioning system defects about which GM knew were not known to the Plaintiffs or other Class Members, nor could they be reasonably discovered by them. This is the classic case of a hidden defect known to the designer, manufacturer, marketer and seller, and about which the buyers/ lessees would never know prior to purchase or lease.

72.    Defendants knew the facts about the Class Defects were material to prospective purchasers/lessees. No one wants to buy a car with a defective air conditioning system that could fail at any time. After all, GM made air conditioning systems standard on Class Vehicles because no one would purchase one without air conditioning or with a system that would fail without notice due to defects in parts.

73.    Defendants knew the buyers and lessees of the Class Vehicles were unaware of the Class Defect and that they did not have an equal opportunity to discover the truth.

74.    Although it had many opportunities to reveal the facts, Defendants instead deliberately chose to be silent with respect to the Class Defect. Even when asked by TV news stations in 2017, GM declined to comment. Indeed, on

information and belief, General Motors still has not publicly admitted to the existence of the Class Defect.

75.    The reason Defendants failed to reveal the defects in the Class Vehicles air conditioning system was because it knew such defects would impact sales. The purpose of GM's silence was to induce buyers and lessees, including Plaintiffs and the Class Members, to purchase or lease Class Vehicles.

76.    Plaintiffs and Class Members relied on the non-disclosure. Had they known the true facts, they would not have purchased or leased the Class Vehicles or would have paid substantially less.

77.    Plaintiffs and Class Members are entitled to recover actual damages in an amount to be proven at trial.

78.    Defendants' conduct constitutes fraud. Accordingly, Plaintiffs and all Class Members are entitled to recover exemplary damages from Defendants in an amount to be determined by the jury.

79.    Because Defendants' conduct constitutes fraud, Plaintiffs and Class Members are also entitled to equitable relief, including but not limited to recision and disgorgement of profits made by Defendants as a result of Defendants' fraudulent concealment.

### *CAUSE OF ACTION NUMBER 2-UNJUST ENRICHMENT*
**(On behalf of Plaintiffs and the National Class or,**
**Alternatively, the Arkansas and Texas Classes)**

80.     Plaintiffs, individually and on behalf of the National Class or, alternatively, on behalf of the Arkansas and Texas Classes respectively, incorporate by reference all other allegations contained in this pleading.

81.     Plaintiffs bring this cause of action on behalf of themselves and all Class members.

82.     Plaintiffs and Class Members have purchased and/or leased Class Vehicles. They would not have made these purchases or entered into these leases had they known of the air conditioning defects in the Class Vehicles, or they would have paid less for the purchases or leases.

83.     Defendants have made a profit as a result of these purchases and/or leases by Plaintiffs and Class Members. The profit would have been reduced or completely eliminated had the Plaintiffs and Class Members not purchased or leased the Class Vehicles, or if they had paid a reduced amount for the purchase or lease of the vehicles.

84.     At the time of the purchase or lease of the Class Vehicles, Defendants knew or should have known of the defects in the air conditioning systems of the Class Vehicles, but made the decision not to reveal, but instead to conceal, the nature of the defects to purchasers and lessees or prospective purchasers and lessees. Indeed, at no time have Defendants ever admitted there were defects with

the air conditioning systems across the Class Vehicles or notified owners or lessees of the defects.

85.    Plaintiffs and Class Members, on the other hand, had no way of ascertaining the existence or nature of the Class Defects prior to their purchase and/or lease of the Class Vehicles.

86.    In these circumstances it would be unjust or inequitable for Defendants to retain the benefit of the profits they obtained from Plaintiffs and the Class Members. Defendants should be required to make restitution to the Plaintiffs and Class Members of the profits obtained by failing to reveal the nature and/or existence of the Class Defects in the Class Vehicles.

### CAUSE OF ACTION NUMBER 3-
### CLAIMS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES ACT
#### (On behalf of Plaintiffs and the Texas Class)

87.    Plaintiffs, on behalf of themselves and all members of the Texas Class, incorporate by reference all the allegations in this pleading.

88.    Plaintiffs bring this cause of action on behalf of themselves and all members of the Texas Class.

89.    The Plaintiffs who are Texas residents bring this cause of action under the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Comm. Code §17.41, *et. seq.* (hereinafter "DTPA") for themselves and on behalf of all members of the Texas Class.

90.    The Class Vehicles are "goods" as that term is defined by §17.45(1).

91.    Plaintiffs and all members of the Texas Class are "consumer[s]" as that term is defined in §17.45(4) and thus entitled to bring this claim.

92.    Defendants are both corporations that were engaged in "trade" and "commerce" in the State of Texas as those terms are defined in §17.45(6), and thus can be sued under the DTPA.

93.    Defendants engaged in "unconscionable action[s] or course[s] of action" as those terms are defined in §17.45(5). These unconscionable actions and courses of action were a producing cause of damages to Plaintiffs and all members of the Texas Class.

94.    Defendants engaged in or employed false, misleading, or deceptive acts or practices that were relied on by the Plaintiffs and other members of the Texas Class to their detriment, as described in this pleading. Among the false, misleading or deceptive acts or practices set forth in §17.46 in which Defendants engaged are:

      a.      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have;

      b.      Representing that goods or services are of a particular standard, quality or grade, if they are of another;

      c.      Knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service; and

      d.      Failing to disclose information concerning goods or services which was known at the time of the transaction, when such failure to disclose such information was intended to induce

Plaintiffs and the Class Members into transactions that they would not have entered into had the information been disclosed.

95.    Each of these false, misleading or deceptive acts or practices was a producing cause of the damages suffered by Plaintiffs and members of the Texas Class.

96.    Plaintiffs and Texas Class Members bring claims against Defendants seeking damages and equitable relief under §17.50 for the unconscionable actions and/or courses of action and the false, misleading or deceptive acts or practices committed by Defendants, as described in this pleading.

97.    Plaintiffs on behalf of the Texas Class have not given Defendants sixty days written notice of their DTPA claim.

98.    Plaintiffs have incurred substantial damages in an amount to be proven at trial as a result of violations of the DTPA by Defendants.

99.    Defendants acted knowingly, as that term is defined by Texas Business & Commerce Code Section 17.45(9). Plaintiffs and members of the Texas Class are entitled to recover damages from Defendants for the mental anguish each has and will suffer, as well as up to three times the amount of their economic damages, as provided by Texas Business & Commerce Code Section 17.50(b)(1).

100.    Defendants acted intentionally, as that term is defined by Texas Business & Commerce Code Section 17.45(13). Plaintiffs and each member of the Texas Class are entitled to recover damages from Defendants for the mental anguish each has and will suffer, as well as up to three times the amount of their

damages for mental anguish and economic damages, as provided by Texas Business & Commerce Code Section 17.50(b)(1).

101.    Plaintiffs and Texas Class Members also seek equitable relief under §17.50(b)(2), including recision and disgorgement of any profits made as a result of Defendants' violations of the DTPA and any orders necessary to restore to any Plaintiff or Texas Class Member any money which may have been acquired by Defendants in violation of the DTPA pursuant to §17.50(b)(3).

102.    Plaintiffs and members of the Texas Class are also entitled to recover court costs and reasonable and necessary attorney's fees from Defendants pursuant to Texas Business & Commerce Code Section 17.50(d). The attorneys' fees sought include reasonable fees that counsel for Plaintiffs incurred in the preparation and prosecution of this action, as well as reasonable attorneys' fees for any and all appeals to other courts.

### CAUSE OF ACTION NUMBER 4-NEGLIGENT MISREPRESENTATION
### (On behalf of Plaintiffs and the Texas Class)

103.    Plaintiffs, individually and on behalf of all members of the Texas Class, incorporate by reference all factual allegations in this pleading.

104.    Plaintiffs bring this cause of action on behalf of themselves and all members of the Texas Class.

105.    Defendants made a series of representations about the components, quality and durability of the Class Vehicles and their air conditioning systems to Plaintiffs and the members of the Texas Class. These representations were made in

the course of Defendants' business and/or in support of transactions in which Defendants had an interest. In these representations Defendants supplied false information to Plaintiffs and Texas Class Members for their guidance in deciding whether to purchase and/or lease Class Vehicles.

106.    Defendants did not exercise reasonable care or competence in obtaining or communicating the information described above.

107.    Plaintiffs and Texas Class Members justifiably relied on Defendants' representations in making their decisions whether to purchase and/or lease. Defendants' negligent misrepresentations caused Plaintiffs and the Texas Class Members injuries and damages in an amount to be proven at trial.

108.    Defendants' negligent misrepresentations constitute fraud, were made with malice and/or were acts or omissions that constituted gross negligence, as those terms are defined by the Texas Civil Practice and Remedies Code, Section 41.001. Accordingly, Plaintiffs and the Texas Class Members are entitled to recover exemplary damages from Defendants under this cause of action.

## ANY APPLICABLE STATUTE OF LIMITATIONS IS TOLLED

109.    To the extent Defendants might assert any claim made by any Plaintiff or member of any class is barred by a statute of limitations, Plaintiffs and all Class Members would show that the doctrines of fraudulent concealment and the discovery rule apply, and any potentially applicable statute of limitations is tolled.

### *Fraudulent Concealment*

110.    As set out in this pleading, the Class Vehicles have defects in their air conditioning systems. These defects, which can be objectively verified, are hidden from buyers and lessees, cannot reasonably be discovered and do not manifest themselves until an air conditioning system failure occurs. Even when the air conditioning system fails, the Plaintiffs and Class Members were never advised by Defendants that the failure was due to inherent defects in the air conditioning system of the Class Vehicles, leaving Plaintiffs and Class Members whose systems have failed thinking they were just the victims of bad luck. As for those Plaintiffs and Class Members whose air conditioning systems have not yet failed, they have no reason to know or believe their Class Vehicles have an air conditioning defect and Defendants made the knowing decision not to reveal that defect to them.

111.    Based on the documentary evidence, on information and belief Defendants have been aware of the defects in the air conditioning systems of the Class Vehicles since at least early 2014. Defendants have failed to reveal to Plaintiffs and Class Members the existence of this defect and, on information and belief, have actively concealed their existence.

112.    Any potentially applicable statute of limitations has been tolled by Defendants' fraudulent concealment.

*Discovery Rule*

113.   The defects in the air conditioning systems of the Class Vehicles are inherently undiscoverable until the system fails. Even then, the mere failure of a part of the air conditioning system does not alert an individual owner or lessee of the existence of a Class Defect, much less a defect in the air conditioning systems in all Class Vehicles. This is especially true since Defendants did not reveal these defects to owners, lessees or potential owners and lessees and, on information and belief, made the decision to actively conceal this information.

114.   The existence of these Class Defects in Class Vehicles is objectively verifiable.

115.   Given these facts, any potentially applicable statute of limitations is tolled by the discovery rule until Plaintiffs and Class Members discovered the existence of Class Defects in the Class Vehicles.

## JURY DEMAND

116.   Plaintiffs and Class Members demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

117.   WHEREFORE, Plaintiffs, on behalf of themselves and all other members of the Class, request that citation be issued and served upon Defendants in the form and manner prescribed by law, requiring that Defendants appear and

answer herein; and that upon final hearing hereon, Plaintiffs have judgment against Defendants jointly and severally for the following:

a.   An order determining the causes of action alleged may be maintained as a class action, certifying one or more of the proposed classes, designating Plaintiffs as named representatives of the class or classes and designating the undersigned counsel as Class counsel;

b.   A declaration that the air conditioning systems in the Class Vehicles are defective;

c.   An order requiring Defendants, at their own cost, to notify all class members of the Class Vehicle defects;

d.   An order requiring Defendants to repair the defects in the Class Vehicles in order to eliminate the defects within a reasonable time at no cost to the class members, or to agree to repair the defects in the Class Vehicles at any time in the life of the Class Vehicles at no cost to the class members;

e.   And order requiring Defendants to provide class members a vehicle of the same size and quality as the Class Vehicle any time a Class Vehicle is brought in for the repair of a Class Defect;

f.   An award of all actual, special, incidental, punitive and statutory damages to which Plaintiffs and all Class Members are entitled, including all profits Defendants received as a result of the sale or lease of the Class Vehicles;

g.   An award of reasonable attorney's fees and costs to counsel for Plaintiffs and the class members;

h.   Pre-judgment and post-judgment interest as allowed by law; and

All such other relief, at law or in equity, to which Plaintiffs and Class Members may be justly entitled.

Respectfully submitted,


BY:   __/S /RICHARD SCHECHTER___
      Richard Schechter
      richard@rs-law.com
      SBOT No. 17735500
      LAW OFFICE OF RICHARD SCHECHTER, P.C.
      One Greenway Plaza, Suite 740
      Houston TX 77046-0102
      713-623-8919
      713-622-1680/Fax

      Dennis C. Reich
      dreich@reichandbinstock.com
      SBOT No. 16739600
      REICH & BINSTOCK, LLP
      4265 San Felipe, Suite 1000
      Houston TX 77027
      713-622-7271
      713-623-8724/Fax

      Ernest "Bo" Hopmann, III
      bhopmann@pdq.net
      SBOT No. 09982800
      LAW OFFICE OF ERNEST O. HOPMANN, III
      3700 N. Main Street
      Houston TX 77009
      713-869-9252
      713-869-8859/Fax

      **ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT A

Document ID: 3996395

# #PIT5331: Low A/C Refrigerant Level (Compressor To Condenser Line) - (Oct 6, 2014)

**Subject: Low A/C Refrigerant Level (Compressor To Condenser Line)**

**Models:** **2015 Cadillac Escalade Models**
        **2014 – 2015 Chevrolet Silverado 1500**
        **2015 Chevrolet Suburban, Tahoe**
        **2014 – 2015 GMC Sierra 1500**
        **2015 GMC Yukon Models**
        **For the 2015 models listed, this ONLY applies to early built 2015**
        **models which have a muffler in the compressor to condenser line**



The following diagnosis might be helpful if the vehicle exhibits the symptom(s) described in this PI.

## Condition/Concern

**Note:** This information applies to all 2014 models and early built 2015 models which have a muffler in the compressor to condenser line (2). Shown below are pictures of the compressor to condenser line with the muffler (2) and without a muffler (1).



Some owners may comment that the a/c is blowing warm.

When checking the refrigerant level, it may be noticed that it is very low/empty.

If, after performing normal diagnostics and the source of the leak is either not found, or it is found at/near the rear of the compressor, it may be caused by a small crack in the compressor to condenser line.

The compressor to condenser line may have a small crack or pin hole located at the inside radius of the first bend near the compressor, as shown below.

If the a/c line cracks, it may spray oil and refrigerant onto the a/c compressor, making the source of the leak very hard to identify.

© 2014 General Motors.  All rights reserved.



## Recommendation/Instructions

To repair this condition and prevent it from reoccurring, replace the compressor to condenser line and install the line bracket shown below.



1. Replace the a/c compressor to condenser line, GM part number 23438932 following the appropriate SI replacement procedure.

2. Install line bracket part number 23264893 as shown below and torque bracket bolt to 5.5 - 8 ft lbs (7.5-10.5 NM)



3. Recharge refrigerant system to proper charge level: Utilities to NEW SPEC of 2.02 lbs (920g) (for more info see latest version of PIT5292) and Pick Up Trucks to 1.32 lbs (600g)

4. Leak test system and verify proper operation.

## Parts Information

| Part Number | Description | Qty |
|---|---|---|
| 23438932 | HOSE ASM-A/C CNDSR | 1 |
| 23264893 | BRACKET ASM-A/C CMPR & CNDSR HOSE | 1 |

## Warranty Information

For vehicles repaired under warranty use:

| Labor Operation | Description | Labor Time |
|---|---|---|
| 4415010 | Air Conditioning Compressor Hose Replacement | Use Published Labor Operation Time |

**ADDITIONAL SI KEYWORDS:**

HVAC dye hot

Please follow this diagnostic or repair process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information.



WE SUPPORT
VOLUNTARY
TECHNICIAN
CERTIFICATION

# EXHIBIT B

## #PIE0340: Engineering Information — A/C Inoperative or Poor Performance on Recent Built Vehicles - (May 29, 2015)

**Subject: Engineering Information – A/C Inoperative or Poor Performance on Recent Built Vehicles**

**Models: 2015 Cadillac Escalade**
**2015 Chevrolet Silverado 1500, Suburban, Tahoe**
**2015 GMC Sierra 1500, Yukon**



**Attention: Proceed with this EI ONLY if the customer has commented about this concern AND the PIE number is listed in the Global Warranty Management / Investigate History link (GWM/IVH). If the customer has not commented about this condition or the EI does not show in GWM/IVH, disregard the PI and proceed with diagnostics found in published service information. THIS IS NOT A RECALL — refer to the latest version of Service Bulletin 04-00-89-053 for more details on the use of Engineering Information bulletins.**

### Condition

**Important:** If the customer did not bring their vehicle in for this concern, DO NOT proceed with this EI.

Some customers may comment on the A/C not performing as intended or the A/C not performing at all. This may also be noticed during Pre-Delivery Inspection (PDI) of a vehicle.

Technicians may find no issue and recharge the A/C system.

**Important:** Do not recharge the A/C until the below information is verified.

### Cause

GM Engineering is attempting to determine the root cause of the above condition. Engineering has a need to gather information on vehicles PRIOR to repair that may exhibit this condition. As a result, this information will be used to "root cause" the customer's concern and develop/validate a field fix.

### Instructions

If you encounter a vehicle with the above concern, follow the procedure below:

1. Verify that the vehicle build date is within 90 days of being built or that the vehicle has had warranty work during this period, and that there was No Trouble Found (NTF) with the A/C and is returning.
2. Before connecting gauges, verify that both charge port caps are attached and tight.
3. After removing charge port caps, inspect charge port seals for any damage or abnormalities.
4. Inspect charge port valves for signs of dye or bubbles.
5. Attach gauge to low port only.
6. Attach Scan Tool to DLC connector.
7. Check for DTCs.
   **Important:** If any A/C related DTCs arise, this EI need not be followed further. Continue with normal diagnosis referring to SI.
8. Validate system charge on low side.
   **Note:** Ambient temperature must be over 70°F and gauge pressure without compressor operation above 70 psi.
9. If 50 psi or below, recover and recharge.
10. If low, no charge, and no DTC after charge, attempt to locate the leak with electronic leak detector and document the following regarding the detector and Recovery Machine used:
    - Make/Model
    - SAE Spec
11. If no leak is found, activate the A/C system and run for 20 minutes.
12. After a 20 minute run time, shut down and inspect for refrigerant dye with approved UV light. Document the following regarding the UV light used:
    - Make
    - Type of light used

If a leak is found, document on the Repair Order (RO) and this EI need not be followed further. Continue with normal diagnosis referring to SI.

If system is charged, running, and no leak is found, contact one of the engineers listed below.

### Contact Information

| Engineer Name | Phone Number |
|---|---|
| Jim Resutek | 586-859-9509 |
| Todd Irwin | 248-978-7948 |

Please include the following information if leaving a message:

– Technician name

– Dealer name and phone number

– Complete VIN and repair order (R.O) number

On the repair order, document the date and time the call was placed (even if the engineer was not reached).

If engineering is unable to return the call within one hour, proceed with diagnosis and repair based on information found in SI.

### Warranty Information

© 2015 General Motors. All rights reserved.

If engineer was contacted or required information was provided, use:

| Labor Operation | Description | Labor Time |
|---|---|---|
| 4480328* | Engineering Information – A/C Poor Performance and Diagnosis | 1.2 hrs |
| *This is a unique Labor Operation for bulletin use only. It will not be published in the Labor Time Guide. | | |

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information.



WE SUPPORT
VOLUNTARY
TECHNICIAN
CERTIFICATION